ESSEX COUNTY COURT OF COMMON PLEAS.

CATHERINE RELAY, PETITIONER-APPELLEE, v. CONTINENTAL AMERICAN LIFE INSURANCE COMPANY, RESPONDENT-APPELLANT.

Decided June 13, 1944.

For the respondent-appellant, *Saul J. Zucker.*

For the petitioner-appellee, *John A. Laird.*

FLANNAGAN, C. P. J.  On August 22d, 1941, Irving Relay was engaged in the business of soliciting life insurance for the respondent, Continental American Life Insurance Company. His title was that of general agent.  His compensation was, at the time, purely on a contingent commission basis.  The company  maintained an office and stenographer for his use in room 2011 on the twentieth story of the National Newark and Essex Banking Company building in the City of Newark.  On that day Mr. Relay had lunched with his wife at a restaurant, had something to drink there and had gone with her to her mother's home leaving her at about 4:30 P. M. saying, as she testifies, that he was going to his office.

Mr. Relay at the time was in worrying financial status. He had been previously married and was divorced and had been in serious arrears in his payments of alimony and support for his child by his first wife.  After proceedings in

contempt had been brought he had accomplished a settlement. but it would seem he was probably in arrears in payment of support for the child and he was in default on notes which he had given on the settlement in compromise of the accumulated alimony. He was in debt to his insurance company on a loan and had had trouble with the company over his bad checks sent for premiums collected by him and in regard to his failure to pay over premiums collected. He was at the time in arrears in that regard. He carried a policy on his own life, the premium upon which was unpaid and the days of grace expired the day before his death. There was pending in the bankruptcy court an application by him for discharge in bankruptcy and objections to his discharge had been filed on the morning of August 22d, 1941, at 10:30 A. M.

After leaving his wife (August 22d, 1941) and at approximately 7:00 to 7:30 P. M. Mr. Relay appeared at the National Newark and Essex Bank Building. Where he had been or what he had done during the intervening period from 4:30 o'clock when he left his wife does not appear. He appeared at the bank building without hat or coat and wore bright. suspenders. He asked the operator operating elevator No. 14 to take him to the twentieth floor. Being asked by the operator how he felt he answered "not so good." The operator took him to the twentieth floor as requested and saw him start along the hallway towards room 2011, the said office provided for him by the Insurance Company, the respondent.

Some minutes thereafter the janitress or cleaner, Mrs. Zeh, who was cleaning the office of Mr. Rippel on the second floor of the Rippel Building, saw from the window of that office the body of Mr. Relay descending in the air, strike the ground in the parking lot, face downward and turn over. She screamed and she and her husband, who was an employee of the Rippel Building, went to the scene to render Mr. Relay any possible help. Mr. Zeh was the first person on the scene where the body lay. His wife called the police. Mr. Relay died almost immediately on striking the ground.

Andrew Murray, senior watchman of the bank building, testified that having been told about 7:30 by the elevator man that he had taken a man to the twentieth floor who seemed.

to be "very sick," he took the police to that floor and there he saw something on the hall floor, "a sort of slimy substance." He found the window at the end of the hallway on the twentieth floor open. Police Officer Reilly testified that he found what he described as "vomit," on the hallway floor and window sill on the twentieth floor. The window on the twentieth floor is at the end of the hallway and overlooks the ground or parking space, as it is called, where the body of Mr. Relay landed.

The petitioner, Catherine Relay, widow of the decedent, brought proceedings in the Compensation Bureau claiming that Mr. Relay came to his death by virtue of an accident arising out of and in the course of his employment. She was successful, the Bureau granting awards aggregating over $16,000. Respondent now appeals to this court.

The respondent contends: (1) that the death was a suicide; (2) that the deceased, Mr. Relay, was an independent contractor; and (3) that the accident (if it be one) did not arise out of and in the course of his employment.

It is patent that upon the question at issue as to whether the petitioner's deceased precipitated himself from the said hallway window or accidentally toppled out of it, that the point where he landed twenty stories below in the parking space is important. If he toppled out he would naturally fall close to a point directly under the window but if he jumped out he might land some distance away from that point. The respondent contends that he landed about forty-five feet in a northeasterly direction from a point on the ground immediately under the said window, the point of landing being twenty feet out from the wall of the National Newark and Essex Building and thirty feet out from the wall of the Rippel Building. The wall of the Rippel Building in which Mr. Rippel's office window opens bounded the southerly side of the parking lot while the wall of the bank building in which the said twentieth story window opens, bounded it on the westerly side. The physical situation is shown on a diagram drawn to scale and marked *Exhibit R-10*.

In fixing the point where the body landed the respondent relies upon the testimony of petitioner's witness John Zeh,

upon the fact that the wife, another petitioner's witness, says she saw the falling body before it struck the ground from the window of Mr. Rippel's office, and upon the photos taken by the police of the body and surrounding objects as it lay in the parking lot.

Mr. Zeh in his testimony estimated the position of the body as twenty feet out from the wall of the bank building and thirty feet out from the wall of the Rippel Building. He characterized his estimate on cross-examination as "guess" but it was obviously an estimate before his characterization as well as after. Whether it be called a guess or an estimate is not of great moment; it was evidently his best effort to locate the point after a lapse of about two years. Respondent argues from the diagram that as twenty feet out from the bank building is exactly opposite Mr. Rippel's office window from which Mrs. Zeh says she saw the body falling in the air that this part of her testimony tends to confirm her husband's testimony that it landed twenty feet out from the bank building.

The proof in regard to the point where the body lay after the fall is left in a very unsatisfactory status. The respondent contented itself with relying on the said testimony of the petitioner's said witnesses and on the photos taken by the police. The record shows that Officer Reilly, another officer, Troy, who was with him, the elevator man who took Mr. Relay to the twentieth floor, and Andrew Murray, the superintendent, all saw the body lying in the parking lot and yet none was asked its position by either side. The record also indicates that the ambulance surgeon, members of the emergency squad including Sergeant Stein and Officers Abbot and O'Leary must have seen the body where it lay and yet none of these persons, who were apparently eye witnesses of the location, was called by either side.

In further support of its claim that decedent precipitated himself from the window the respondent produces testimony that in order for the body to land at the point indicated by Mr. Zeh it would have to have left the window at a velocity in a lateral direction equal to about one-half that of a runner traveling at the rate of 100 yards in ten seconds. Respondent

also introduces detailed measurements of the twentieth floor hall window sill, arguing its construction to be such as to make it difficult, for one to fall out of it unintentionally.

Taking all the circumstances together I am inclined to the opinion that "the preponderance of probabilities, according to the experience of mankind" is that Mr. Relay, sick and in a period of depression intentionally projected himself from the window; although it may well be that the answer as to how he came to his death whether by accident or design remains, on the evidence adduced, in the realm of speculation rather than in that of proof. *Cf. Kramerman* v. *Simon,* 131 *N. J. L.* 251; *36 Atl. Rep.* (*2d*) 132.

However, I prefer to rest my decision on another ground, to wit, that petitioner has not sustained the burden of proof by a preponderance of the evidence that decedent, Mr. Relay, came to his death by an accident arising out of his employment.

Assuming that Mr. Relay was not an independent contractor, that he started down the hallway from the elevator for room 2011 for the purpose of performing duties in furtherance of his employment, that he came back to the hall window on the twentieth floor and fell accidently therefrom, it still remains that it must be shown by proof that the injury arose out of his employment. I am of the opinion that it does not so appear.

The immediate and controlling cause of Mr. Relay's going to the window was not for the purpose of performing services for his employer, it was to relieve himself of his sickness. There is nothing to show that his sickness arose out of or was caused by anything done while doing anything in the performance of the duties of his employment or that it had any connection with his employment. It was a stomach upset with the customary reaction, namely, a desire to vomit. The window was a point of danger outside and away from the premises of his employer. If his nausea be regarded as a call of nature there was the usual appropriate, convenient and safe place to relieve himself under such conditions made available by his employer, namely, the toilet or lavatory.

It is argued that the toilet may have been locked but there

is nothing in the evidence which supports this hypothesis evolved by petitioner's counsel.

The diagram of the building shows that in going from room 2011 to the window at the end of the hallway Mr. Relay had to pass a short connecting hallway leading to the toilet and that the toilet was about as near to room 2011 as was the window at the end of the hall. He elected to go outside the working premises to a place of danger, unusual, unappropriate and unused for the instant purpose when a safe, customary, suitable and convenient place had been made available by his employer. His action and consequential injury did not arise out of his employment, or, indeed, in the course of it.

The case of *Reynolds* v. *Passaic Valley Sewerage Commission,* 130 *N. J. L.* 437; 33 *Atl. Rep.* (2d) 595; 131 *N. J. L.* 327; 36 *Atl. Rep.* (2d) 429, is cited by petitioner, but it seems to me not in point. In that case a shanty 5½ by 6 feet containing a pot stove was provided by the employer for the use of a watchman in the discharge of his employment. The watchman, who was partially paralyzed fell in an epileptic fit against the stove and was, as a result, burned. Thus it appears that the employer had established a dangerous *locus* of employment in the form of the cramped quarters with the pot stove therein which contributed to the injuries sustained by the employee. The stove and surrounding circumstances established by the employer constituted a dangerous instrumentality incidental to the employer's business which constituted a contributing cause to the workman's injuries. No such situation exists in the instant case. In that case the sickness causing the accident did not arise out of the employment, but the injury did; while in the instant case neither the sickness nor the injury arose out of the employment.

I conclude that the petitioner has failed to sustain the burden of proving that the decedent came to his death by an accident which arose out of his employment. *Cf. Kramerman* v. *Simon, supra.*

A determination may be submitted under rule 9 in accordance therewith, dismissing the petition.